STATE OF CALIFORNIA, on Behalf of the CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL; the Hazardous Substance Account; and the Hazardous Substances Cleanup Fund, Plaintiff,

v.

HYAMPOM LUMBER COMPANY, a California Corporation; Robert M. Garrett, an individual; Dorothy Davidson, an individual; Walter D. Garrett, an individual; and Van Patton Garrett, an individual, Defendants.

No. CIV. S–94–1579 WBS/PAN.

United States District Court,
E.D. California.

Sept. 18, 1995.

Reed Sato, Sally Magnani Knox, Attorney General's Office for the State of California, Sacramento, CA, for plaintiffs.

Daniel S. Frost, Carr Kennedy Peterson and Frost, Redding, CA, for defendants Hyampom Lumber Co., Jack E. Beebe.

James A. Brennan, DeCuir and Somach, Sacramento, CA, for defendant Robert E. Garrett.

William Eric Hvidsten and Elizabeth W. Johnson, De Cuir & Somach, Sacramento, CA, for defendants Van Patton Garrett and Walter D. Garrett.

Gregory Scott Spencer, Bank of America NT & SA, San Francisco, CA, Bruce S. Flushman, Washburn Briscoe and McCarthy, San Francisco, CA, for Bank of America NT & SA.

### MEMORANDUM AND ORDER

SHUBB, District Judge.

The State of California brings this CERCLA cost recovery action in an effort to recoup expenses it incurred cleaning up a contaminated lumber mill site in Trinity County. The State moves for summary judgment against each defendant on the grounds that there is no dispute of material fact as to liability under 42 U.S.C. § 9607. Defendants oppose the State's motion and also move for summary judgment on the grounds that the State's action for cost recovery is barred by the six-year statute of limitations provided at 42 U.S.C. § 9613(g)(2)(B).[1]

1. Defendants Dorothy Davidson, Walter Garrett, and Van Patton Garrett filed a motion for summary judgment and an opposition to the State's motion for summary judgment. Hyampom Lumber Company has filed notices joining defendants' motion and their opposition. Defendant Robert Garret did not respond to either motion, but counsel for the moving defendants represented to the court at hearing, that Robert Garrett joined in the moving defendants' motion and opposition.

2. The Jensen Site consists of several parcels of land, only two of which, Trinity County Assessor's Parcel No. 11–21–03 (the Jensen side) and

### Background

The relevant facts are undisputed. The State filed this action on September 30, 1994, to recover the costs it incurred cleaning up chemical contamination at the Jensen Site, an area of land in Trinity County, where, at various times between 1948 and 1983, a lumber mill was operated.[2] During operations, lumber milled at the site was treated by dipping it into a chemical solution. Over the years, the solution, which contained pentachlorophenol and tetrachlorophenol, would drip onto and leak into the ground at the site.

The Jensen Site first came to the attention of the State in March 1984 when the North Coast Regional Water Quality Control Board asked the California Department of Health Services[3] to dispose of the contents of an apparently leaking and abandoned dip tank on the Jensen side of the site. The Department went in, drained the tank and targeted the site for further response actions. In January 1985, funds were authorized for the investigation and final cleanup of the Jensen Site. Soil sampling was conducted in August, September and December of 1987. This sampling revealed widespread contamination. Additionally, between September 28 and October 5, 1987, a chain link fence was constructed around the building which had contained the leaking dip tank.

On June 24, 1988, the Department issued a Draft Remedial Action Plan ("Draft RAP"). The Draft RAP concluded that the appropriate remedial response was to excavate and remove the contaminated soil from the site. Between July 5th and July 8th the Department installed a second fence, this one rented and temporary, around the contaminated area on the Hyampom side of the site. Also

Trinity County Assessor's Parcel No. 11–21–80 (the Hyampom side), are relevant to this motion. Both sides of the site contained dip tanks at one time or another and both sides contained contaminated soil.

3. According to plaintiff, the relevant environmental regulatory responsibilities of the Department of Health Services were assigned to the Department of Toxic Substances Control on July 17, 1991. In its moving papers plaintiff refers to these two state agencies jointly as the "Department." The court will do the same.

in July, the Department conducted further soil sampling and drilled several wells to be used for monitoring groundwater.

On September 15, 1988, a subcontractor installed a twenty foot lumber pole and necessary electrical hardware and ran a power line into an office building at the site. Over the following few days, the same subcontractor installed new pipes which provided water to the site from a nearby pond. Both the water and the electricity were installed temporarily to be used only for the duration of the State's response action. Phone service was also connected at this time.

The final Remedial Action Plan ("RAP") was approved on October 19, 1988. As in the Draft RAP, under the final RAP, contaminated soil was to be excavated and trucked away and replaced with uncontaminated fill. The final RAP also concluded that the cinderblock building that had housed the leaking dip tank discovered in 1984 would be demolished and removed, and that the "green chain" area would be steam cleaned. These remedies had still been tentative in the Draft RAP. In addition, the final RAP provided for ongoing monitoring of groundwater. Excavation operations began on October 24, 1988.

### Statute of Limitations

■ The limitations periods governing cost recovery actions are set forth at 42 U.S.C. § 9613(g)(2). This section provides in pertinent part that an "initial action for recovery of costs referred to in section 9607 of this title must be commenced . . . for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, . . ." The State filed its suit on September 30, 1994. Thus, the suit is timely if the "initiation of physical on-site construction of the remedial action" occurred on or after September 30, 1988. If the "initiation" occurred prior to that date, the suit is untimely and must be dismissed.

The State argues that the limitations period began to run on October 24, 1988, when excavation began at the site. Defendants propose three different dates as accrual points: October 2, 1987, when the fence was constructed on the Jensen side; July 5, 1988, when the second fence was put up on the

Hyampom side of the site; and September 15, 1988, when the subcontractor began to install the water and electrical hardware. As the relevant facts are undisputed, the issue before the court is one of law and is therefore appropriate for resolution on summary judgment. *Asuncion v. District Director of U.S. INS,* 427 F.2d 523, 524 (9th Cir.1970).

The court begins with the statutory language. The limitations period began to run on plaintiff's cost recovery action with the "initiation of physical on-site construction of the remedial action" at the Jensen site. Thus, in order to trigger the limitations period of § 9613(g)(2)(B) the relevant event must possess the following attributes. First, it must be "physical." Second, it must have occurred "on-site." Third, the activity must be part of the "construction of the remedial action." Fourth and finally, in addition to possessing the above characteristics, the activity must constitute the "initiation" of the remedial action.

The precise question before the court is whether any of the three accrual events proposed by defendants has all of these characteristics. The first two factors are easily satisfied. The erection of both fences, the installation of the electrical pole and hardware, and the installation of the water lines were each "physical" activities and each occurred "on-site."

■ The third factor is more difficult. The question of whether a given activity is "construction of the remedial action" calls for a two-part inquiry. First, the activity must be "remedial." Under CERCLA, response actions are characterized as either "removal" or "remedial." Though these terms have lengthy statutory definitions, it is generally held that "removal actions" are short-term, temporary responses to an immediate threat as well as actions taken to assess, monitor and evaluate a given site, while "remedial actions" are those measures taken to achieve a permanent solution. *E.g., Exxon Corp. v. Hunt,* 475 U.S. 355, 360, 106 S.Ct. 1103, 1108, 89 L.Ed.2d 364 (1986). In essence, a remedial activity is one which is "consistent with permanent remedy taken instead of or in addition to removal actions . . . to prevent or

minimize the release of hazardous substances ..." 42 U.S.C. § 9601(24).[4]

Second, in addition to being "remedial," the activity must be part of the "construction of the remedial action." "Construction" is not defined in CERCLA and seems a poor word choice to define the types of physical activities that would go on during a remedial action, inasmuch as the term ordinarily connotes the creation of something that did not exist before, rather than the repair or cleansing of something that already exists. *E.g.*, *Cabell v. City of Portland,* 57 P.2d 1292, 1297 (Or.1936); *Larson v. Crescent Planing Mill Co.,* 218 S.W.2d 814, 820 (Mo.App.1949). The court may not read the statute so as to make "construction" a nullity, however. The term still serves the purpose of excluding those preliminary and tentative "physical on-site" activities that while related to the remedial action, are not part of its "construction."

There is no question but that the installation of the fences and utilities were consistent with the permanent remedy, and that these installations served the purpose of preventing or minimizing the release of hazardous substances. The fencing marked off the contaminated areas and helped identify those zones where workers were required to wear additional safety gear. The fences also served to warn passers-by and keep them outside the contaminated zones. Water was necessary for steam cleaning the "green chain" area, and for dust control, which among other things, would minimize the toxic exposure to the lungs of the workers and anyone who happened nearby. Electricity was necessary to power the office equipment used during the cleanup, and to provide lighting at night.

■ Plaintiff nevertheless contends that this action is timely because these activities are "removal" actions and therefore cannot be fairly classified as "remedial." In support of its position, plaintiff cites a number of district court decisions for the proposition that a "removal" action is not complete until a document has been issued which contains the final remedy selected for the site. *United States v. R.A. Corbett Transport, Inc.,* 785 F.Supp. 81, 82 (E.D.Tex.1990); *United States v. Petersen Sand and Gravel, Inc.,* 824 F.Supp. 751, 755 (N.D.Ill.1991); *United States v. Rohm and Haas Co.,* 790 F.Supp. 1255, 1264–65 (E.D.Pa.1992), *rev'd on other grounds* 2 F.3d 1265 (3d Cir.1993). In plaintiff's view, these cases stand for the idea that *every* response action that occurs prior to final approval of the permanent remedy must be characterized as a "removal" action. Thus, plaintiff argues, any response activity which occurred at the Jensen site prior to October 19, 1988 is a "removal" action as a matter of law, and therefore cannot trigger the accrual of the limitations period of § 9613(g)(2)(B).

These cases do not, and in fact could not, consistent with CERCLA, stand for the proposition that remedial activity could not begin prior to the final approval of the permanent remedy. This would make the

---

**4.** 42 U.S.C. § 9601(24) provides in its entirety as follows:

The terms "remedy" or "remedial action" means (sic) those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

lengthy definition of "remedy" and "remedial action" appearing in § 9601(24) meaningless—the terms would simply be defined as all response activities which occur after final approval of the permanent plan.

█ Plaintiff also points to legislative history, in particular, to a Report by the House Judiciary Committee which defined the accrual point of § 9613(g)(2)(B) as "the commencement of physical on-site construction of the remedial action, *that is, after the RI/FS and after design of the remedy.*" H.R.Rep. No. 99–253(III), 99th Cong., 1st Sess., *reprinted in* 1986 U.S.C.C.A.N. 2835, 3044 (emphasis added). While it is the general rule that CERCLA is to be broadly construed in favor of achieving its remedial purpose of cleaning up sites and affixing liability, *Kaiser Aluminum & Chemical Corp. v. Catellus Dev.*, 976 F.2d 1338, 1340 (9th Cir.1992), only a clear statement of contrary legislative history may override unambiguous statutory language. *National Organization for Women Inc. v. Scheidler,* —— U.S. ——, ——, 114 S.Ct. 798, 806, 127 L.Ed.2d 99 (1994). This language in the legislative history is not enough to add a qualification not placed in § 9613(g)(2)(B) by its drafters. *See 3550 Stevens Creek Assoc. v. Barclays Bank,* 915 F.2d 1355, 1363 (9th Cir.1990) At any rate, the quoted language is of little help to plaintiff since it refers to the "design of the remedy," not the final approval. The Draft RAP was finished and released before the second fence was erected and before work began on the electrical and water. It was clear at this point from the "design" contained in the Draft RAP that fencing and utility service were central parts of the "construction of the permanent remedy." Thus, the court rejects plaintiff's argument that a "remedial action" may not occur prior to the final administrative approval of the permanent remedy.

However, the court does agree with plaintiff that the installation of the first fence around the cinderblock building on the Jensen side of the site was a "removal" action under CERCLA. First, fencing is specifically listed as a "removal action" in § 9601(23). Second, this fence was installed on or about October 2, 1987, more than nine months before the Draft RAP was issued, and while RI/FS testing was still ongoing. It is beyond dispute that RI/FS activities, such as the testing and monitoring that went on at the Jensen site, are "removal" activities for purposes of CERCLA, since "removal" is expressly defined to include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances ..." 42 U.S.C. § 9601(23). Thus the installation of the first fence served the purpose of temporarily securing the Jensen side of the site while other removal actions were completed. Though a closer call, the installation of the second fence may also be characterized as a "removal" action. While it was put up after completion of the Draft RAP, it also served the purpose of securing the site while RI/FS monitoring and testing was conducted.

The court need not address the question of whether "removal" and "remedial" actions are mutually exclusive, since the installation of the electrical pole and water lines were clearly not "removal" actions. The definition of "removal" does not list the provision of utility services as one of its examples, however, it does include the catch-all phrase, "such actions as may be necessary (sic) taken in the event of the threat of release of hazardous substances into the environment ..." 42 U.S.C. § 9601(23). Thus, at least in some cases, installation of utilities might be "removal" actions. If, for example in the instant case, the utilities had been connected in 1987 while on-site assessments and evaluations were still ongoing, the installation would in all likelihood be characterized as a "removal" action. The installation in this case, however, commenced on or about September 15, 1988. There is no evidence indicating that any monitoring, assessing, or other "removal" activities took place at the site after that date, or that the utilities were used for any "removal" purpose whatsoever. To the contrary, the utilities played a critical role in the implementation of the permanent remedy. Therefore, the installation of the utilities was "remedial" rather than a "removal" action.

The installation of the utilities was also part of the "construction of the remedial

action." It is undisputed that the utility pole and the water lines were installed for the sole purpose of providing power and water to the Jensen Site during the implementation of the permanent remedy. Moreover, water and power were central to various aspects of the remedy, including fire control, dust suppression, steam cleaning, and lighting.

Finally, since the installation of the utilities was the first step taken in implementing the remedy, it marked the "initiation" of the remedy as well. There is no authority for the view that each "remedial" activity undertaken at a site triggers a new cause of action for the cost recovery of that activity. Courts construing § 9613(g)(2)(A), the statute of limitations which governs cost recovery actions for "removal" activities, have uniformly held that all "removal" activities at a site constitute a single "removal" for statute of limitations purposes. *E.g., Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 840 (6th Cir.1994). The same approach applies here.

The court therefore concludes that the "initiation of the physical on-site construction of the remedial action" occurred on September 15, 1988, when work began on the installation of water and electricity to the Jensen Site. Since plaintiff's suit was commenced on September 30, 1994, it is untimely.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment be, and the same hereby is, GRANTED.