ADVANCED MICRO DEVICES, INC., Plaintiff,

v.

NATIONAL SEMICONDUCTOR COR- PORATION and United Technolo- gies Corporation, Defendants.

And Related Actions

No. C 97–20797 RMW.

United States District Court, N.D. California.

Feb. 12, 1999.

Martin C. Checov, Jeffrey M. Judd, O'Melveny & Myers LLP, San Francisco, CA, for plaintiff Advanced Micro Devices, Inc.

Christopher Berka, Thomas E. Kuhnle, McCutchen, Doyle, Brown & Enerson LLP, Palo Alto, CA, for defendants and counterclaimants National Semiconductor Corp. and defendant United Technologies Corp.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

WHYTE, District Judge.

Defendant and counter-claimant National Semiconductor and defendant United Technologies Corporation's ("defendants") motion for partial summary judgment was heard on January 29, 1999. The court has read the moving and responding papers and heard the argument of counsel. For the reasons set forth below, the court grants the motion in part and denies it in part. Summary judgment is granted as to the fourth, fifth, seventh, eighth and eleventh causes of action. Summary judgment is denied as to the first and third causes of action.

### I. BACKGROUND

In 1982, plaintiff Advanced Micro Devices, Inc ("AMD") initiated subsurface in-vestigations at its manufacturing facility at 1165 Arques Avenue, Sunnyvale, California (the "Site") as a result of suspicions of leakage from underground chemical solvent storage tanks and from chemical handling and storage areas.[1] Declaration of Malinda Allison in Support of Defendants' Motion for Partial Summary Judgment ("Allison Decl."), Ex. A at 4. That year, a number of monitoring wells were drilled, and tests detected volatile organic compounds, principally in the ground water of the A and B aquifers under the Site. Id. at 4–6. After two phases of investigation at the Site were completed, the California Regional Water Quality Control Board ("RWQCB") requested that AMD begin studies for the installation and operation of a ground water extraction and treatment system, and Phase 3 studies were developed to comply with the RWQCB's request.[2] Id. at 7.

In 1984, AMD removed two subsurface waste solvent tanks and two subsurface acid neutralization systems. Id. ¶ 7, Ex. A at 13, 14, 41.

In 1986, AMD "initiated an interim remedial measure in the 'A' aquifer," consisting of the installation of ground water extraction wells, with the investigation continuing. Id. at ES–4, 8. Several of the borings that had been drilled into the aquifers were converted to monitoring wells, and several borings and monitoring wells were converted to extraction wells. Id. at 8–9. On August 20, 1986, the RWQCB issued Order No. 86–64, Waste Discharge Requirements, in which it reported:

[f]urther investigation and interim remedial action are necessary to prevent the continued migration of pollutants to unaffected groundwaters and to preclude loss of existing and potential beneficial uses of said waters. The board intends to establish final cleanup objec-

1. Monolithic Memories, Inc. ("MMI") first occupied the Site in 1970; MMI and AMD merged in 1987. The two companies are collectively referred to as "AMD" in this order.

2. Four phases of site studies were ultimately undertaken by AMD. Id.

tives for the site after review of the results of actions required by this order.

Declaration of Reed M. Content in Opposition to Motion of Defendants for Partial Summary Judgment, ("Content Decl.") Ex. 2 at 2 ¶ 6. The extraction wells were connected to a centrally located ground water treatment facility, which began full-time operation in 1986. Declaration of Lance D. Geselbracht in Support of Defendants' Motion for Partial Summary Judgment ("Geselbracht Decl.") Ex. B. ¶ 2.3. By 1987, the EPA had placed the Site on the National Priority List for cleanup. Allison Decl. at Table 1.

On June 15, 1987, in response to the RWQCB's Waste Discharge Requirements, AMD submitted a Ground Water Extraction System Installation report to the RWQCB. Geselbracht Decl.Ex. A. The report stated in part that "all ground water extraction efforts have been directed to the 'A' level aquifer," that ground water extraction and treatment systems were operational, and that the eight A aquifer extraction wells should be operational "until the final zone of influence can be determined," at which point "additional extraction wells may be required." *Id.* at ¶¶ 1.1, 5.1.1–5.2.1.

On August 15, 1987, a Ground Water Extraction and Treatment System Status Report prepared for AMD reported that AMD was not responsible for contamination in the B aquifer, but that additional extraction wells may be required "in order to establish the necessary hydraulic control to contain and cleanup the MMU plume" in the A aquifer. *Id.* Ex. B at ¶¶ 4.2, 2.2. The report stated that "[t]he treatment facility has proved to be effective in removing volatile chemicals from ground water." *Id.* at ¶ 2.3. AMD initiated B aquifer extraction activities in 1988 as an "interim remedial measure." Allison Decl.Ex. A at 9.

On April 19, 1989, Administrative Order No. 89–061 adopted the cleanup site requirements for AMD. *Id.* Ex. A at 1.

In April, 1991, AMD's Final Draft Remedial Investigation ("RI") was prepared in response to the 1989 Administrative Order. *Id.* Ex. A. The RI stated that:

[t]he purpose of this RI is to define the nature and extent of contaminants in the environment ... to characterize the hydrogeological conditions to the extent necessary for the development, selection, and design of appropriate remedial actions; and to assess the risk to human health and the environment ... These results will be used in the FS portion of the RI/FS [Draft Remedial Investigation/Feasibility Study] to determine remedial action alternatives and additional remedial action(s) necessary and appropriate for the Site.

*Id.* at 1–2. The RI noted that the existing "interim remediation program consists of pumping and treatment of ground water from several 'A' aquifer extraction wells installed in August 1986," and that "the data collected as part of this RI are sufficient to complete the assessment of final remedial measures for the soil and ground water cleanup." *Id.* at ES–5. AMD submitted a final draft FS (Feasibility Study) Report on May 9, 1991. Allison Decl.Ex. B at 5.

On September 20, 1991, the RWQCB adopted California RWQCB Board San Francisco Bay Region Order No. 91–139, Site Cleanup for Advanced Micro Devices, National Semiconductor Corporation. *Id.* Ex. B. The September 20, 1991 order in part reviewed AMD's RI/FS and stated that the technical information in the RI and FS Reports "is acceptable for developing a final cleanup plan" and that the reports "contain an evaluation of applicable or relevant and appropriate requirements ..., the interim remedial actions, final remedial alternatives, and proposed remedial standards." *Id.* Ex. B at 5. The order also stated that AMD would be held "jointly responsible for ground water cleanup in the A and B aquifers" pursuant to the RWQCB cleanup order. *Id.* The order reviewed the "interim remedial actions" which AMD had implemented in 1986, consisting of the extraction and

treatment of the A aquifer water from wells and the addition of three extraction wells in 1988. *Id.* at 9. The order evaluated the alternatives which had been set out in AMD's Feasibility Study, and provided ,a summary of the "final remedy for Subunit 2" based primarily on the information provided in the RI/FS Reports.[3] *Id.* at 12.

In September of 1991, the EPA issued its Record of Decision ("ROD"), which presented the "selected remedial action" for the Site. Content Decl.Ex. 1 at 6. The ROD described the current, ongoing ground water extraction activities, which were "implemented under RWQCB authority with the goal of controlling further contaminant migration while ongoing site investigations continued to collect the data necessary for final remedial action." Content Decl.Ex. 1 at 20. The ROD then presented the elements of the "selected final remedy" and the steps necessary to implement that remedy. *Id.* at 6–7, 20–22. The ROD reported that "the currently operating extraction system will be expanded" in order to implement the final remedy. *Id.* at 20. The ROD stated that

> [t]he goal of this remedial action is to restore the groundwater to its beneficial use, which is, at this site, a potential source of drinking water. Based on information obtained during the RI and on a careful analysis of all remedial alternatives, EPA and the RWQCB believe that the selected remedy will achieve this goal.

*Id.* at 46.

AMD filed the present contribution action on September 19, 1997.

## II. ANALYSIS

### A. AMD's First and Third Causes of Action Under CERCLA

1. *Actions for Contribution under CERCLA*

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), authorizes actions against statu-

torily defined "responsible parties" to recover a party's costs incurred in cleaning up hazardous waste disposal sites. *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1300 (9th Cir.1997). 42 U.S.C. § 9613(g)(2) provides the statute of limitations for such cost recovery actions:

> (2) Actions for recovery of costs
>
> An initial action for the recovery of the costs referred to in section 9607 of this title must be commenced—
>
> (A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and
>
> (B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph...

In 1986, Congress amended the CERCLA statute to clarify and confirm that, in addition to allowing cost recovery actions by non-responsible parties against responsible parties, CERCLA also recognizes claims for contribution *between* "potentially liable parties." The new statute, 42 U.S.C. § 9613(f)(1), specifically provides:

> (1) Contribution. Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under 9607(a) of this title. Such claims shall be brought in accordance with this section and the

---

**3.** "Subunit 2" refers to the downgradient AMD site, a portion of a the larger Sunnyvale Operable Unit 1 site. *Id.* at 1–2.

Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9613(g)(3) was also added to provide the statute of limitations for § 113(f)(1) contribution actions:

> (3) Contribution. No action for contribution for any response costs or damages may be commenced more that 3 years after—
>
> > (A) the date of judgment on any action under this chapter for recovery of such costs or damages, or
> >
> > (B) the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

As is discussed in Part II.A.2 below, § 113(g)(3) by its terms does not contemplate an "initial action," such as the present one, in which no action preceded the contribution suit and therefore no cost recovery judgment, order, consent decree or settlement can or will trigger the § 113(g)(3) limitation period.[4] The first question raised by the present motion is, therefore, what statute of limitations governs a § 113(f)(1) "initial action" for contribution.

### 2. The Applicable Statute of Limitations for "Initial" Contribution Actions Under CERCLA

In the absence of a statute of limitations expressly applying to "initial" contribution actions, defendants assert that the statute

of limitations of 42 U.S.C. § 9613(g)(2)(A), regarding recovery of costs for a "removal action," and (B), regarding recovery of costs for a "remedial action," govern this action. AMD, on the other hand, contends that § 113(g)(3) is the sole statute of limitations for contribution claims, and must be applied even where there can be no triggering event.

In *Sun Co. Inc. v. Browning-Ferris, Inc.*, 124 F.3d 1187 (10th Cir.1997), the plaintiffs brought a contribution action under § 113 after incurring cleanup costs in response to an EPA unilateral administrative order, which is not one of the triggering events under § 113(g)(3). The court recognized that potentially responsible parties ("PRP's") who were jointly responsible for a waste site could seek contribution from other PRP's, but that "[i]f those PRP's have never been defendants in a civil action under §§ 106 or 107, however, it appears that there is no statute of limitations governing their contribution claims." *Sun*, 124 F.3d at 1191. Therefore, plaintiffs who incur cleanup costs without a prior civil action "potentially have an unlimited time in which to bring their contribution claims." *Id.* The court in *Sun* addressed the problem by applying the limitations period of § 113(g)(2) to the contribution claim before it. That section applies, the court reasoned, because a § 113(g) contribution action is actually "an action for recovery of the costs referred to in § 107" from PRP's whose liability is defined by § 107. *Id.* at 1192. Defendants here argue that, under *Sun*, CERCLA §§ 113(g)(2)(A) and (B) are the statutes of limitations which apply to AMD's CERCLA contribution claims.

In *Reichhold Chemicals, Inc. v. Textron, Inc.*, 888 F.Supp. 1116 (N.D.Fla.1995), however, the court held that § 113(g)(3) is the only statute of limitations applicable to a CERCLA contribution claim, even where there is no event to trigger the limitations

---

4. The parties agree that none of the events which may trigger the § 113(g)(3) statute of limitations have occurred. Memorandum of

Points and Authorities of Plaintiff AMD in Opposition to Motion of Defendants for Partial Summary Judgment at 10:1–4.

period, and "[i]t is not necessary, or even proper, to borrow another limitations period." *Reichhold*, 888 F.Supp. at 1125. In *Gould, Inc. v. A & M Battery and Tire Service*, 901 F.Supp. 906 (E.D.Pa.1995), the plaintiff argued that, since none of the triggering events under § 113(g)(3) had occurred in his contribution action, the action could not be time-barred by that section. The court agreed, and held that the action was timely. *Gould*, 901 F.Supp. at 914–15.

The Ninth Circuit has yet to rule on the question of what statute of limitations applies in "initial" CERCLA contribution actions.[5] In *City of Merced v. R.A. Fields*, 997 F.Supp. 1326 (E.D.Cal.1998), the court stated, in dicta, that either the Tenth Circuit's approach in *Sun*, or the approach applied by the *Sun* district court, whereby the § 113(g)(3) limitations period is triggered by an event not listed in the statute,[6] should apply. The court stated that it would not be inclined apply § 113(g) to an initial action, in which the statute could never be triggered. *City of Merced*, 997 F.Supp. at 1334.

 The court agrees with the Eastern District's indication in *City of Merced* that some limitations period which is capable of accrual should apply to an initial contribution action, and adopts the approach taken by the Tenth Circuit in *Sun*. A contribution action is a type of cost recovery action, and, prior to the enactment of § 113(f), courts recognized an implicit right to contribution arising out of § 107 cost recovery actions. *See U.S. v. Colorado & Eastern R. Co.*, 50 F.3d 1530, 1535 (citing *Mardan Corp. v. CGC Music Ltd.*, 804 F.2d 1454, 1457 n. 3 (9th Cir.1986) ("district courts have interpreted § 107 of CERCLA to impose, as a matter of federal law, joint and several liability for indivisi-

ble injuries with a correlative right of contribution.")). Accordingly, where the plaintiff in *Pinal Creek* argued that the § 113(g)(2) cost recovery statute of limitations could not apply to its contribution action, the Ninth Circuit, without ruling on the question, responded that the argument was

> based on the incorrect premise that a contribution action is not brought under § 107. Thus, the choice presented between a contribution action created and governed exclusively by § 113, on the one hand, and an independent "cost recovery action" available to working PRPs exclusively under § 107, on the other, is a false one. As we have concluded above, a PRP's contribution action finds implicit recognition in § 107; § 113 merely regulates its implementation.

*Pinal Creek*, 118 F.3d at 1305 n. 7. Therefore, the court concludes that § 113(g)(2) applies to initial contribution actions under CERCLA, since § 113(g)(2) expressly provides the statute of limitations for § 107, the original source of the right to contribution under CERCLA.

### 3. The § 113(g)(2)(A) Limitations Period for "Removal Action" Cost Claims

 The question of whether an action can be characterized as a "removal" action or a "remedial" action is one of law appropriate for resolution on summary judgment. *State of California v. Hyampom Lumber Co.*, 903 F.Supp. 1389, 1391 (E.D.Cal.1995).

 Under § 113(g)(2)(A), an action for recovery of the costs of a "removal action" must be filed within three years after "completion" of the "removal action."

---

5. In *Pinal Creek Group, supra,* the Ninth Circuit noted in dicta that "[t]he court directly faced with the issue must determine whether § 113(g)(3), § 113(g)(2), or some other statute should apply." *Pinal Creek Group*, 118 F.3d at 1305.

6. The district court in *Sun* ruled that a contribution action under § 113(g)(3) accrues when a party seeking contribution has paid more than its fair share of the common liability. *Sun*, 124 F.3d at 1189.

"Removal" is defined by 42 U.S.C. § 9601(23) as

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

"Removal refers to short-term action taken to halt the immediate risks posed by hazardous wastes." *Fairchild Semiconductor Corp. v. United States EPA,* 769 F.Supp. 1553, 1555 (N.D.Cal.1991). "During the removal action phase, a site posing a risk of hazardous waste release is studied and various cleanup options considered." *Id.* The site-specific study which ensues is the RI/FS. *Id.* "Once the RI/FS has been completed, EPA will choose the remedial action appropriate for the site." *Id.* "Removal action is taken before remedial action." *Id.*

Defendants contend that, here, "removal" was completed more than three years before the complaint was filed. Defendants characterize the initiation of the site inspection in 1982, the removal of the two waste solvent tanks and two subsurface acid neutralization systems in 1984, and the removal of contaminated soil in 1984 as "removal action," which "culminated with a completion of a RI/FS in May, 1991," more than three years before the complaint was filed.

AMD appears to concur. *See* Opp. at 13:8–9 ("The activity conducted at the site between 1982 and 1991 was 'removal action,' not remedial action."). However, AMD argues that, even if § 113(g)(2) does apply, a contribution claim for the "removal" activities is not time-barred under § 113(g)(2) because "remedial action" was begun within three years of completion of the "removal action." *See* Part II.A.5, *infra.*

### 4. The § 113(g)(2)(B) Limitations Period for "Remedial Action" Cost Claims

■ Under § 113(g)(2)(B), an action to recover costs of a "remedial action" must be filed "within six years after initiation of on-site construction of the remedial action. . . ." The term "remedial action" is defined by 42 U.S.C. § 9601(24) as:

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the pub-

lic health and welfare and the environment. . . .

"Remedial action refers to permanent remedies taken instead of or in addition to removal, including the destruction of hazardous wastes." *Fairchild,* 769 F.Supp. at 1555.

Defendants contend that the "physical on-site construction" of "remedial action" activities commenced no later than 1986, when ground water extraction wells were installed in the A aquifer and the ground water treatment facility began operation. Defendants note that through June, 1997, the extraction system reportedly treated 1,775,400 gallons of ground water, and the treatment facility was reported "to be effective in removing volatile chemicals from ground water" as of August, 1987. Geselbracht Decl.Ex. B ¶ 2.3. Defendants conclude that the ground water extraction and treatment system constituted "cleanup of released hazardous substances" and "on-site treatment" and thus was "remedial action" as defined by 42 U.S.C. § 9601(24).

AMD counters that these actions were "removal," not "remedial," because all actions which occur before the selection of the permanent remedy are necessarily "removal" actions, and because the RI/FS process, which was ongoing in 1986, "is a type of removal activity." Opp. at 15:5–10 (citing *Kelley v. E.I. DuPont de Nemours and Co.,* 17 F.3d 836, 840–41 (6th Cir. 1994)). AMD contends that no "remedial" action can take place until the ROD is issued because no "remedy" has been determined until that time. "Remedial actions are generally response actions conducted in accordance with a ROD." *United States v. Akzo Nobel Coatings, Inc.,* 990 F.Supp. 897, 904 (E.D.Mich.1998). AMD notes that "just because what would otherwise be a removal action effects a permanent remedy does not convert that response into a remedial action." Opp. at 15 (citing *U.S. Steel Supply, Inc. v. Alco Standard Corp.,* No. 89–C–20241, 1992 WL 229252 at *10 (N.D.Ill. Sept. 9, 1992)).

In *Hyampom,* cited by both parties, the suit was timely under the § 113(g)(2)(B) statute of limitations as long as the "remedial action" was initiated on or after September 30, 1988. The plaintiff argued that any activity which occurred prior to issuance of the October 19, 1988 Final Remediation Plan ("RAP") was a "removal" action as a matter of law. The court disagreed on the ground that the *draft* RAP, issued on June 24, 1988, had disclosed the central elements of the design of the permanent remedy. *Hyampom,* 903 F.Supp. at 1393. The court firmly rejected the proposition that remedial action can never occur prior to the final approval of the permanent remedy. "This would make the lengthy definition of 'remedy' and 'remedial action' appearing in § 9601(24) meaningless—the terms would simply be defined as all response activities which occur after final approval of the permanent plan." *Id.* at 1392–93. However, the court held that fence installation which occurred "more than nine months before the Draft RAP was issued, and while RI/FS testing was still ongoing" was removal activity. "It is beyond dispute that RI/FS activities, such as the testing and monitoring that went on at the Jensen site, are 'removal' activities for purposes of CERCLA, since 'removal' is expressly defined to include 'such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances . . .'" *Id.* at 1393 (citing 42 U.S.C. § 9601(23)). Even certain fence installation which took place *after* the Draft RAP was issued was deemed "removal action," because it served the purpose of securing the site while RI/FS monitoring and testing were conducted. *Id.* The court also noted that "fencing is specifically listed as a 'removal action' in § 9601(23)." *Id.*

In characterizing installation of an electrical pole and water lines on the site, on the other hand, the *Hyampom* court noted that, had those utilities been connected while on-site assessments and evaluations were still ongoing, "the installation would in all likelihood be characterized as a 're-

812

moval' action." *Id.* The court also noted that although § 9601(23) (defining "removal" action) does not specifically list utility installation, utilities could fall within that section's catch-all phrase, "such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment." *Id.* However, the court found that "the utilities played a critical role in the implementation of the permanent remedy," and there was no evidence that they were used for any "removal" purpose whatsoever. *Id.* The water and power lines were installed for the "sole purpose of providing power and water to the Jensen site during the implementation of the permanent remedy," and "water and power were central to various aspects of the remedy, including fire control, dust suppression, steam cleaning, and lighting." *Id.* at 1394. The utility installation was therefore "remedial," not "removal" activity, and "remedial action" therefore began on September 15, 1988, the date that utility installation work was initiated. *Id.*

■ Under *Hyampom*, therefore, several factors assist in the characterization of an action as "removal" or "remedial": (1) proximity to disclosure of the final remedial design, which may occur prior to approval of the final remedial plan, (2) whether RI/FS monitoring and testing are ongoing at the time of the action, (3) whether the action falls within the statutory definition of "removal" (or "remedial") and (4) the action's role in the implementation of the permanent remedy.

The Seventh Circuit's decision in *United States v. Navistar Int'l Transportation Corp.*, 152 F.3d 702 (7th Cir.1998) comports with that of the Eastern District of California in *Hyampom*. In *Navistar*, as in *Hyampom*, the plaintiffs argued that the court should establish a rule that "remedial action" cannot begin until the EPA issues final, written approval of the remedial design. The court declined to adopt such a "bright-line" rule. *Navistar*, 152 F.3d at 711 ("If [Congress] had intended to

require that the EPA issue its final approval of the remedial design in order for a 'remedial action' to begin ... Congress surely would have provided us with a more explicit direction to that effect."). The court explained that a "remedial action" is one that is "consistent with" the particular permanent remedy that has been developed for the site. *Id.* at 712. Because "[i]t is undisputed that the remedial action for the site called for the construction of a permanent clay cap," that construction was "remedial action," and the statute of limitations began to run on the date construction of the cap was initiated. *Id.* at 713. Although the *Navistar* court did not discuss when the design of the remedy was first disclosed, final written approval of the remedy was issued just two days after the clay cap construction was initiated. *Id.* at 705, 713.

Here, defendants argue that "remedial" action was initiated at the Site no later than April, 1986, when wells were drilled for the water extraction system. Looking to the first factor addressed by the *Hyampom* court, proximity to disclosure of the final remedial design, no evidence of a "draft" of the plan of remediation has been submitted to the court. The April, 1991 RI/FS reveals that, four years after the 1986 water extraction activity was initiated, different alternatives for final remedial action were still being proposed and evaluated. The evidence indicates that design of the final remedy was not disclosed until the September, 1991 ROD issued.

With regard to the second factor addressed by *Hyampom*, whether RI/FS monitoring and testing were ongoing at the time of the activity, investigation at the Site began in 1982, and Site testing was still being conducted in November of 1989. Allison Decl.Ex. A at 16; Content Decl.Ex. 1 at 19 ("Soil sampling programs at AMD–Arques began in 1982 and have been conducted as recently as November 1989, under RWQCB oversight, to identify source areas for soil and groundwater contamination."). Evaluation and analysis of the

testing results were not completed until the RI/FS issued in April, 1991. The technical information gathered by AMD and provided in the RI/FS was reported to be "acceptable for developing a final cleanup plan" only as of the September 20, 1991 RWQCB Order No. 91–139.

With regard to the third *Hyampom* factor, whether the action falls within the statutory definition of "removal" or "remedial," installation of the water extraction system could constitute "cleanup of released hazardous substances" under the § 9601(24) definition of "remedial action." The evidence includes numerous references to the extraction system installation prior to the ROD as a "remedial measure" or an "interim remedial measure." *See, e.g.,* Content Decl.Ex. 2 at 1; Allison Decl. Ex. A at ES–4. Further, the ROD states that the purpose of the extraction and treatment system initiated in 1986 was "to control contaminant migration in the subsurface [and] control contaminant transport," (Content Decl.Ex. 1 at 18) a purpose which comports with the § 9601(24) definition of "remedial action," as one taken "to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger. . . ." However, the court also notes that in *Hyampom,* the utility installation was "remedial" even though it could fit within the statutory definition of "removal." *Hyampom,* 903 F.Supp. at 1393.

■ The fourth consideration discussed in *Hyampom* is the action's role in the implementation of the permanent remedy. Although the well extraction system at the Site was ultimately expanded as part of the permanent remedy, the system could not, upon its installation, have "played a critical role in the implementation of the permanent remedy," because the permanent remedy was not determined until four years later. The ROD reports that the extraction system was implemented "with the goal of controlling further contamination migration while ongoing site investigations continued to collect the data neces-

sary for final remedy selection." Content Decl.Ex. 1 at 20. In *Hyampom,* it had been clear at the time that the utilities were installed that they were "central parts of the 'construction of the permanent remedy'" because the Draft RAP had by that time disclosed what the design of the final remedy was. Here, the design of the final remedy had not been developed or disclosed when the extraction wells were installed at the Site in 1986, and there is no evidence that they were disclosed before September, 1991. The fact that the extraction activities ultimately did not turn out to be "short-term," because they were implemented in the final remedy four years later, cannot now be considered in hindsight.

■■ Under *Hyampom* and *Navistar,* the formal adoption of the final remedy is not a "bright-line" cut-off between "removal" and "remedial action." *Id.* at 1392–93; *Navistar,* 152 F.3d at 711. However, here, the September 21, 1991 ROD was the first statement of what the final remedy was to be. No final remedy design, in draft form or otherwise, was apparently issued until September 21, 1991. "Remedial action" could not take place until that design was known, and until the RI/FS assessment process had reported sufficient information to allow for design of the remedy.

### 5. Recovery of "Removal Action" Costs

■ Section 113(g)(2)(B) provides that "if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph." AMD contends that "the removal action was completed with the RI/FS and ROD process in September, 1991." Opp. at 22:8–10. Defendants agree that the removal action "was 'completed' in 1991 when the RI/FS was completed," but claim that the remedial action was not initiated three years *after* that removal action because the remedial action, which commenced in 1986 according to defendants,

*preceded* the removal action. Memorandum of Points and Authorities in Support of Defendants' Motion for Partial Summary Judgment at 8–9. The court has herein concluded that removal activity was completed, and remedial action commenced, in September, 1991. *See* Part II.A.4, *supra.* The removal and remedial actions were therefore within three years of each other, and the action for contribution for removal costs is timely under § 113(g)(2)(B).

**B. *AMD's Fourth and Fifth Causes of Action for Contribution Under State Law***

 Defendants claim that the California Code of Civil Procedure § 388(a) three-year statute of limitations for actions "based upon a liability created by statute" applies to AMD's fourth and fifth causes of action for contribution under California Health & Safety Code § 25363. AMD claims that the applicable statute of limitations is "one year or two" under *Mangini v. Aerojet–General Corp.,* 230 Cal.App.3d 1125, 1154–55, 281 Cal.Rptr. 827 (1991), *aff'd,* 12 Cal.4th 1087, 51 Cal.Rptr.2d 272, 912 P.2d 1220 (1996), and that the period runs from the time each payment was made by the claimant.[7] "In the absence of a contrary statutory command, a cause of action for equitable indemnity does not come into existence until the indemnitee has suffered loss through payment." *Id.* at 1154, 281 Cal.Rptr. 827. Here, however, AMD's claim is not a common law claim for equitable indemnity as was the case in *Mangini;* it is brought under statute. In *Acme Fill Corp. v. Althin CD Medical, Inc.,* 1995 WL 822665 (N.D.Cal.), this court held that a claim under Cal. Health & Safety § 25363 accrues at the same time as a CERCLA contribution claim, since

the California Hazardous Substance Account Act (Cal. Health & Safety Code § 25300 *et seq.*) is patterned directly on CERCLA. There is, therefore, a "contrary statutory command" here, and the fourth and fifth causes of action accrued, like the CERCLA causes of action, in September of 1991. The Cal.Code Civ.Proc. § 388(a) three-year statute of limitations applies to claims under Cal. Health & Safety Code § 25363. *Acme,* 1995 WL 822665 at \*4. Therefore, the complaint, filed in September of 1997, is untimely as to the fourth and fifth causes of action.

**C. *AMD's Seventh and Eighth Causes of Action for Negligence and Negligence Per Se***

 Defendants argue that AMD's seventh and eighth causes of action are barred by the Cal.Code Civ.Proc. § 338(b) three-year statute of limitations, since AMD suspected alleged damage and began investigation no later than 1983.[8] A cause of action for negligence arising from alleged property damage due to hazardous waste contamination accrues when the plaintiff discovers the injury and its cause, or should have through the exercise of reasonable diligence. *Mangini,* 230 Cal. App.3d at 1150, 281 Cal.Rptr. 827. In *Mangini,* the court held that the cause of action accrued when "plaintiffs had sufficient information to put them on notice of the possibility that defendant had dumped hazardous waste on their land." *Id.* at 1152–53, 281 Cal.Rptr. 827. Here, regardless of whether the investigation begun in the early 1980's would trigger the statute of limitations, there can be no dispute that as of at least September 1991, after the RI/FS investigation and testing process was complete and the ROD was issued,

---

**7.** AMD argues that CERCLA § 158 specifically provides that any state statute of limitations period shall commence no earlier than the accrual date for the federal CERCLA claims; however, if the state claims accrued, like the federal claims, in 1991, those state claims would be untimely under a one-, two-, or three-year state statute of limitations, whereas

the federal claims would still be timely under the six-year § 113(g)(2)(B) CERCLA statute of limitations.

**8.** The evidence indicates that AMD's investigation began in 1982. Allison Decl.Ex. A at 4.

AMD was on notice of defendants' potential responsibility for hazardous waste at the Site. The negligence claims, filed six years later, are barred by Cal.Code Civ. Proc. § 338(b). Summary judgment is therefore granted as to the seventh and eighth causes of action.

### D. *AMD's Eleventh Cause of Action for Attorneys' Fees*

■ AMD's eleventh cause of action is for an award of attorneys' fees under California Code of Civil Procedure § 1021.5. That section provides that a court may award attorneys' fees to a successful party in a "private attorney general" action which (a) enforces an important right affecting the public interest, and (b) confers a significant benefit (pecuniary or nonpecuniary) upon the general public or a large class of persons, if (c) the necessity and cost to plaintiff in bringing its private enforcement action outweighs its stake in the action. Cal.Code Civ.Proc. § 1021.5; *Woodland Hills Residents Ass'n v. City Council,* 23 Cal.3d 917, 934–35, 154 Cal. Rptr. 503, 593 P.2d 200 (1979); *Beach Colony II v. Coastal Comm'n,* 166 Cal. App.3d 106, 110, 212 Cal.Rptr. 485 (1985).

> The purpose of an award of attorney fees pursuant to section 1021.5, is to encourage suits that enforce "common interests of significant societal importance, but which do not involve any individual's financial interest to the extent necessary to encourage private litigation to enforce the right. To encourage such suits, attorney fees are awarded when a significant public benefit is conferred through litigation pursued by one whose personal stake is insufficient to otherwise encourage the action. Section 1021.5 was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest."

*Satrap v. Pacific Gas and Electric Co.,* 42 Cal.App.4th 72, 78, 49 Cal.Rptr.2d 348 (1996) (citing *Beach Colony II,* 166 Cal. App.3d at 114, 212 Cal.Rptr. 485) (internal citations omitted). Therefore, where the primary effect of a lawsuit is to advance or vindicate a plaintiff's personal economic interests, an award of fees under § 1021.5 is improper, even if some incidental public benefit derives from the suit. *Flannery v. California Highway Patrol,* 61 Cal. App.4th 629, 635, 71 Cal.Rptr.2d 632 (1998); *Kaufman and Broad–South Bay v. Unisys Corp.,* 822 F.Supp. 1468, 1478, (N.D.Cal.1993), *disapp'd on other grounds, KFC Western, Inc. v. Meghrig,* 49 F.3d 518 (9th Cir.1995). A § 1021.5 request for attorneys' fees may be denied where the potential recovery of damages creates sufficient financial incentive to bring the lawsuit. *See Satrap v. Pacific Gas and Electric Co.,* 42 Cal.App.4th 72, 78, 49 Cal. Rptr.2d 348 (1996) (discussing *Luck v. Southern Pacific Transportation Co.,* 218 Cal.App.3d 1, 267 Cal.Rptr. 618 (1990)).

■ Here, AMD seeks recovery of its cleanup costs from defendants. Although the cleanup itself may have conferred an incidental benefit on the public, AMD had a strong personal, financial incentive to bring suit, namely, to recover the amounts it has expended cleaning the Site. Further, as defendants argued at the hearing on this motion, the public derives no particular benefit if AMD ultimately prevails in this action, for the Site cleanup has or will occur regardless of whether it is AMD or defendants that are ultimately responsible for paying for it. AMD's suit, as distinguished from the cleanup activities which underlie it, confers no significant benefit upon the general public. Defendants' motion is therefore granted as to the eleventh cause of action.

### E. ORDER

For the foregoing reasons, the court grants defendants' motion in part and denies it in part. Summary judgment is granted as to the fourth, fifth, seventh, eighth and eleventh causes of action. Summary judgment is denied as to the first and third causes of action.