UNITED STATES of America, Plaintiff,

v.

AMBROID COMPANY, INC., Contract Packaging Corp., Robert M. Kuzara, and J. Frank Strauss, Defendants.

J. Frank STRAUSS, Third–Party Plaintiff,

v.

Bank Hapoalim, Third–Party Defendant.

CA No. 97–11377–JLT.

United States District Court, D. Massachusetts.

Jan. 26, 1999.

Donald G. Frankel, U.S. Department of Justice, Newton Corner, for USA.

Robert M. Kuzara, Lynnfield, MA, pro se.

Richard E. Bachman, John A. King, East Bridgewater, MA, for J. Frank Strauss.

Christopher P. Davis, Goodwin, Procter & Hoar, Boston, MA, for Bank Hapoalim.

## MEMORANDUM

TAURO, Chief Judge.

Plaintiff United States brings this action under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607, for recovery of costs incurred by the cleanup of the Yankee Chemical Corporation site from March 1992 to February 1993 and on June 17, 1994. Before the court are the parties' cross motions for summary judgment.

### I

### BACKGROUND

In March 1992, the Environmental Protection Agency (EPA) instituted a cleanup operation in response to the release or the threat of release of hazardous substances from the Yankee Chemical site, pursuant to section 104 of CERCLA, 42 U.S.C. § 9604. The EPA conducted a series of cleanup and removal activities from March 1992 to February 1993, recorded in seven Pollution Reports (PolReps) by the On Site Coordinator (OSC) Carole Tucker.

The last report by OSC Tucker, dated February 12, 1993, states that the EPA

agents had shipped off chemical wastes, shut down electricity and telephone services, withdrew security personnel, and sealed off the premises. The EPA also left behind drums of hazardous chemicals (Penta–San and Mercury compounds) which it deemed to have no legally-approved methods of disposal. The EPA gave the Massachusetts Department of Environmental Protection (MA DEP) keys to the storage building to perform periodic inspections and to further explore methods of disposal. OSC Tucker wrote at the bottom of that final PolRep: "case closed."

On June 16, 1994, eighteen months after the closing of the site, MA DEP informed the EPA that the site had been broken into and the drums scattered, creating new threats of release. OSC Thomas Condon was assigned to the project. OSC Condon took immediate emergency actions, and retroactively filed an Action Memorandum for funding. The drums were removed on June 17, 1994.

The government alleges that total cleanup of the site cost over a million dollars. It demands judgment for that amount, as well as a declaratory judgment for all future cleanup costs. At issue is whether the government's claim is time barred.

## II

### ANALYSIS

CERCLA requires the government to bring a suit to recover costs of a removal action within three years after the removal effort is completed. 42 U.S.C. § 9613(g)(2)(A). The issue in these cross motions is whether the EPA's June 17, 1994 removal was a new removal action for purposes of § 9613(g)(2)(A), or whether it was an extension of the removal action completed on February 12, 1993.

Because there are no material facts in dispute, this issue is ripe for summary judg-

ment. If, as the government argues, the EPA's activities constitute one continuous "removal action" beginning in March 1992 and ending in June 1994, the government's claim for the entire cleanup cost would be timely. If, as Defendants argue, the EPA's actions constitute two separate "removal actions," the first of which ended in February 1993, the costs associated with those removal activities would be barred from recovery under the three-year statute of limitations.

### A. Statutory and Case Law Provide Limited Guidance

A basic rule of statutory interpretation is to give the language of the statute its "plain meaning." See U.S. v. Gomez–Rodriguez, 96 F.3d 1262, 1264 (9th Cir.1996). Unless otherwise defined, terms should be interpreted as having their ordinary, contemporary, and common meaning. See Perrin v. U.S., 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). While CERCLA's definition of "removal" includes all activities the EPA conducted in this case,[1] the statute does not define when removal activities become distinct, successive "removal actions."

Most precedents on statute of limitations involve ongoing removal and remedial efforts by the EPA which made up one removal action, even though the activities were conducted in stages. These cases generally interpret "removal action" broadly. See Kelley v. E.I. DuPont de Nemours and Co., 17 F.3d 836, 843 (6th Cir.1994) (holding that the two essential purposes of CERCLA are cleaning up hazardous waste and doing so at the expense of those who created it); U.S. v. R.A. Corbett Transport, Inc., 785 F.Supp. 81, 82 (E.D.Tex.1990) (holding that all activities

---

1. The definition is as follows:
   [T]he cleanup or *removal of released substances* from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to *monitor, assess, and evaluate the release or threat of release of hazardous substances,* the *disposal of removed material,* or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. 42 U.S.C. § 9601(23) (emphasis added).

conducted at the site, including remedial investigations, were one "removal action").

The Sixth Circuit in *Kelley* found that the emergency physical removal activities conducted by the EPA from 1984 to 1986, and its removal of later discovered waste[2] in 1987, were one removal action under § 9613(g)(2)(A). *See* 17 F.3d at 841. The court relied on the First Circuit's decision in *Reardon v. U.S.*, 947 F.2d 1509, 1519 (1st Cir.1991) (en banc), which held that "[t]he running of the statute of limitations is entirely within The EPA's control ... [t]he government may take its own sweet time before suing, and ... the removal or remedial action may itself take years to complete." *See* 17 F.3d at 843.

*One Wheeler Road Assoc. v. Foxboro Co.*, 843 F.Supp. 792, 795 (D.Mass.1994), was factually similar to *Kelley*. Judge Young, following the Sixth Circuit's lead, held that "CERCLA should be given a broad and liberal construction, and should not be narrowly interpreted to frustrate the government's ability to respond promptly, or to limit the liability of those responsible for cleanup costs beyond the limits expressly provided."

The *Wheeler* plaintiff conducted clean-up in three stages: (1) an excavation of a contaminated leaching basin in 1986; (2) further assessment in 1987 to ascertain vertical and lateral extensions of the groundwater contamination; and (3) remediation and removal of the remaining contamination from the property in 1989. *See id.* at 794. The plaintiff brought a recovery claim, and the defendant sought a partial summary judgment to avoid the costs incurred three years before the suit was brought. Judge Young held that the plaintiff's recovery action was timely, and "[t]he removal process is complete only after the very last drum of contaminated soil has been removed from the property." *Id.* at 796.

The case at bar is factually distinguishable from both *Kelley* and *Wheeler.*

## B. *EPA Activities Did Not Constitute A Single Removal Action*

The totality of the unusual circumstances involved here warrant a finding of separate and distinct removal actions. Although the court recognizes the important policies CERCLA was enacted to protect, treating the cleanups in this case as a single removal action would render the statute of limitations a dead letter.

### 1. *Closing the Site*

The first unusual circumstance in this case is the EPA's closing of the Yankee Chemical site. In *U.S. v. Poly–Carb, Inc.*, 951 F.Supp. 1518, 1528 (D.Nev.1996), Judge Reed addressed the exact issue of whether "closing out a site" equals the "completion of a removal action" for purposes of the three year statute of limitations of 42 U.S.C. § 9613(g)(2)(A). In concluding that it does, Judge Reed reasoned:

> The question, then, is whether "closing out" constitutes "completion" of the Poly–Carb Site "removal action." We find that no reasonable jury could answer this question in the negative .... It can hardly be disputed that *off-shipment of contaminated material* and securing of monitoring wells *in particular*, and backfilling of soil and *removal of equipment* and *electrical power* as well, are the final activities necessary to bring the site of a removal action such as this to a [completion]. 951 F.Supp. at 1529 (emphasis added).[3]

According to the EPA records in this case, on site removal activities began in March 1992. By August 1992, most of the work was done and the EPA demobilized much of its crew and equipment. It was not until January of 1993, however, that OSC Tucker finally closed off the site by shipping off all but five drums of hazardous chemicals, removing the last of the equipment, disconnecting electrical power and telephone lines, withdrawing

---

2. This type of removal is termed Remedial Investigation/Feasibility Study ("RI/FS") procedures, which often followed an emergency EPA action to ensure that the contaminated site is completely free of hazardous wastes.

3. The difference in *Poly–Carb* was that the government's action there was timely, because it was filed within three years of the closing of the site.

security personnel, and sealing off the premises.

■ Applying *Poly–Carb*'s rule to this case, the EPA closing of the site in January and February of 1993 evidences completion of the first removal action. The government argues that the closure procedures at the site in February 1993 were reasonable because EPA agents did not know at the time when they would be able to dispose of those last drums. This court disagrees in light of all other factors present in this case such as EPA's transfer of responsibilities to the State, its' own records indicating the two actions as separate, and its failure to follow the mandates of the National Contingency Plan. These factors argue against a finding that the EPA's original intent was to treat the operations as one removal action.

### 2. *Transfer of Responsibilities*

The second unusual circumstance in this case is the EPA's transfer of responsibility for the site to the Massachusetts authorities after closing the site. This transfer was evidenced by The EPA's PolRep 7, written by OSC Tucker on February 12, 1993. After describing the drums of Penta–San and mercury compounds left on-site, OSC Tucker wrote, "The MA DEP will investigate further options for these materials and will maintain a key to the property to perform periodic inspections." Carol Tucker, The EPA Pol-Rep 7 & Final, 2/12/1993, p. 2.

Eighteen months later, MA DEP brought the EPA back into the case when it informed the EPA on June 16, 1994 that the site had been broken into and drums opened and strewn about. The government conceded in its Statement of Material Facts Not in Dispute that "MA DEP informed the EPA that it did not have sufficient financial resources to address the problem and requested that the EPA take action to stabilize the situation and/or dispose of the hazardous substances located at the Site." U.S. Statement ¶ 9.

The sequence of events indicates that the EPA transferred its responsibilities for the site to State authorities in January and February of 1993. It reclaimed control of the site in June of 1994 only after the break-in, and because MA DEP lacked financial resources to solve the problem.

### 3. *The EPA Itself Treated the Removal Actions as Separate*

The third unusual circumstance in this case is the EPA's treatment of the two removal actions as separate: (1) OSC Tucker's PolRep written on February 12, 1993 is entitled "PolRep 7 & *Final*"; (2) whereas the final line of PolReps 1 through 6 read "Case Pends," the last line of PolRep 7 reads *"Case Closed"*; (3) OSC Condon's PolRep written on June 28, 1994,[4] referred to the removal activities conducted by OSC Tucker as "the initial removal action"; and (4) the EPA's own Web Site[5] designating activities supervised by OSC Tucker and OSC Condon as separate "removal actions."

The government argues that the administrative definition of "removal action" does not dictate its meaning for purposes of the statute of limitations. It cites for support *Pneumo Abex Corp. v. Bessemer and Lake Erie R. Co.*, 936 F.Supp. 1250, 1261 (E.D.Va.1996), which held that a removal action was not complete for statute of limitations purposes until 1994, when the Record of Decision (ROD) was amended. This was so despite an EPA administrative order stating that removal was complete in 1992. The court based its ruling on a line of cases that held an removal action to be incomplete until the issuance of a Record Of Decision ("ROD"). *See United States v. Davis*, 882 F.Supp. 1217, 1225–27 (D.R.I.1995); *California v. Celtor Chem. Corp.*, 901 F.Supp. 1481, 1487–89 (N.D.Cal.1995).

*Pneumo*, however, does not control here, because a ROD will not issue in this case. This site was never listed on the National Priorities List. No alternative remedies were considered. No public comments were nec-

---

**4.** Entitled PolRep 8—Supplemental.

**5.** Superfund Sites—Massachusetts (August 25, 1998)

<http://www.theEPA.gov/oerrpage/superfnd/web/oerr/impm/products/cursites/cmasouta.htm>.

essary. *Pneumo* held that the issuance of a final ROD is more reliable than an administrative order as a marker for the completion of a removal action. Unfortunately, *Pneumo*'s marker does not serve us in this case.

Without authority stating otherwise, this court finds the EPA's own treatment of the removal activities as two separate "removal actions" to be persuasive evidence that there were in fact two separate "removal actions" for purposes of § 9613(g)(2)(A).

### 4. *Not a Case of Interdependent Ongoing Removal Activities*

The EPA's activities in *Kelley* and *Wheeler* were continuous and interdependent. Hazardous wastes were removed as they surfaced through an ongoing process of Remedial Investigation and Feasibility Study. The processes ended with the issuance of a ROD.

The unique circumstance in this case was that all existing hazardous wastes were discovered in 1992. The only thing the EPA had to do to clean up the site was to pack them up and ship them off. No further investigation or study was necessary, and none was performed.

The EPA took custody of the drums, but chose to store some of them on the property, repackaged and relocated to a different part of the site. The EPA allowed eighteen months to elapse until the site was finally broken into creating new threats of release. If the site had not been broken into, the drums may have remained there indefinitely.

### 5. *Failure to Comply With the National Contingency Plan*

Another unusual circumstance in this case is the EPA's failure to comply with the National Contingency Plan. Regulations under CERCLA require the EPA to complete a "removal action" within twelve months "unless the lead agency determines that [t]here is an immediate risk to public health or welfare of the United States or the environment; continued response actions are immediately required to prevent, limit, or mitigate an

emergency; and such assistance will not otherwise be provided on a timely basis." *See* 40 C.F.R. § 300.415(b)(5).

The irony of this case is that had the site not been vandalized eighteen months after its closing, creating an emergency situation involving new threats of release, the EPA would not have been able to fund the final removal activity under the 40 C.F.R. § 300.415(b)(5)(i) exception for the one year rule. *See* The EPA Action Memorandum, June 24, 1994, p. 1.

The EPA may have simply failed to comply with its regulations, which would have no impact on the statute of limitations. Alternatively, the EPA may have deemed its original removal work to have been completed in full compliance with the regulations. There was no way that the EPA could have foreseen that there would be a break-in at the site allowing it another opportunity to finish removing the drums. Yet, the agents took no further actions within that one year period as required by the National Contingency Plan. This court concludes that the EPA must have felt that it had done whatever work it needed to do to close the case.[6]

### III

### *CONCLUSION*

In enacting CERCLA, Congress intended to facilitate cleanup of hazardous wastes and to do so at the expense of those responsible for environmental contaminations. *See Kelley*, 17 F.3d at 843. To that end, courts have consistently interpreted 42 U.S.C. § 9613(g)(2)(A) as broadly as possible within reason.

The broadest reasonable statutory interpretation, however, cannot save this case from its fate of partial summary judgment. Too many indisputable facts indicate that, for all intents and purposes, there were two separate removal actions.

If Congress had wished to forego policies underlying statutes of limitations in order to carry out the fundamental purposes of

---

**6.** This conclusion is consistent with the EPA's transfer of responsibilities to MA DEP and the

language of finality in OSC Tucker's PolRep 7.

CERCLA, it would not have enacted § 9613(g)(2)(A). It is not this court's place now to nullify CERCLA's statute of limitations, nor is it sound judgment to do so.

Because the government failed to bring its recovery claim within three years of the completion of the first removal action, Defendants' motion for partial summary judgment shall be allowed, and Plaintiff's cross motion denied.

AN ORDER WILL ISSUE.

### ORDER

The court hereby orders as follows:

1. Defendant Strauss's Motion for Partial Summary Judgment [# 50] is ALLOWED;

2. Government's Cross Motion for Summary Judgment [# 66] is DENIED;

3. Defendant Strauss's Motion for More Definite Statement, and/or for Clarification of Complaint [# 63] is DENIED;

4. Government's Motion for Leave to File in Excess [# 67] is ALLOWED;

5. Government's Motion to Extend Time [# 72] is ALLOWED;

6. Defendant Strauss's Motion for Extension of Time to File Reply Brief and Opposition [# 80] is ALLOWED;

7. Defendant Strauss's Motions to Strike [# 82, # 83, and # 84] are DENIED;

8. The Government's Unopposed Motion for Extension of Time to file Objections to Rule 26(a)(3) Disclosures of Third–Party Defendant [# 94] is ALLOWED; and

9. The parties are to appear before this court on April 6, 1999 at 10:15 a.m. for a final pretrial conference.

IT IS SO ORDERED.