State of CALIFORNIA DEPARTMENT
OF TOXIC SUBSTANCES
CONTROL, Plaintiff,

v.

ALCO PACIFIC, INC.,
et al., Defendants,

And Related Counterclaims.

No. CV 01–9294 SJO.

United States District Court,
C.D. California.

March 4, 2004.

Bill Lockyer, Attorney General of the State of California, Theodora Berger, Senior Assistant Attorney General, Donald A. Robinson, Supervising Deputy Attorney General, Edward H. Ochoa, Laurie R. Pearlman, Deputy Attorneys General, California Department of Justice, San Diego, CA, for Plaintiff.

Caren J. Dawson, Charles H. Pomeroy, IV, Michael J. Stiles, McKenna Long & Aldridge, Los Angeles, CA, Bruce Sperling, Sperling & Slater, Chicago, IL, David R. Gabor, McDermott Will & Emery, Los Angeles, CA, Eugene J. Frett, Sperling and Slater, Mark A. Bilut, Steven P. Handler, McDermott Will Emery, Chicago, IL, Terrence Mann, McDermott Will & Emery, Los Angeles, CA, Todd R. Wiener, McDermott Will Emery, Chicago, IL, Aaron P. Avila, James M. Schurz, Lauren M. Michals, Michele B. Corash, Morrison & Foerster, San Francisco, CA, Allan E. Ceran, Rodi Pollock Pettker Galbraith & Cahill, Los Angeles, CA, Coralie Kupfer, Kupfer Law & Mediation, Pasadena, CA, Robert Allen Yahiro, Rodi Pollock Pettker Galbraith & Cahill, Colin Lennard, Patricia Jean Chen, Fulbright & Jaworski, Los Angeles, CA, Lisa Schwartz Tudzin, Walter A. Stringfellow, Stringfellow & Associates, Brandon J. Roker, Chris M. Amantea, McDermott Will & Emery, Los Angeles, CA, A Steven Dotan, Gary A. Hamblet, Rebecca S. Glos, Breidenbach Huchting & Hamblet, Los Angeles, CA, for Defendants.

## ORDER RE MOTION FOR SUMMARY JUDGMENT

OTERO, District Judge.

This is a cost recovery action brought by the State of California, Department of Toxic Substances Control ("DTSC" or "the state"), pursuant to the Comprehensive Environmental Response, Compensation

and Liability Act ("CERCLA"). (Order of March 5, 2003.) The state seeks reimbursement of costs incurred cleaning the site of a former lead processing facility in Carson, California, as well as a declaration that it is entitled to recoup any costs it may incur in the future for clean-up of the same facility. (*Id.*) Defendants [1] are moving for summary judgment on the grounds that the state filed its cost recovery suit too late—past the three year statute of limitations contained in section 113(g)(2)(A) of CERCLA, 42 U.S.C. § 9613(g)(2)(A).

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7–15, the Court finds that this matter is appropriate for decision without oral argument. Accordingly, the matter was taken off calendar and placed under submission. Having thoroughly considered the points of law, facts, evidence and legal arguments submitted by counsel for all parties involved, the Court hereby DENIES the moving parties' motion for summary judgment.

## I. BACKGROUND

The moving parties sent material to the Alco Pacific Site (the "Site" or "Alco Pacific Site") while the Site was in operation. The Site is a one-acre parcel of land located in Carson, California. Defendants Alco Pacific and Morris P. Kirk (*collectively* "Alco Pacific") owned and operated the Site from approximately 1950 to 1990. The material sent to the Site by Defendants included lead ingots, cuttings, dross and slag. These materials purportedly contributed to contamination at the Site.

In 1993, DTSC informed the owner of the Alco Pacific Site that it would begin "a removal action," meaning the state intended to remove contaminated materials from the Site. (*See* Plaintiff's Statement of Genuine Issues in Opposition, *hereinafter* "PSGI" at ¶ 9.) The state filed suit on October 29, 2001. Between 1993 and October 29, 2001, DTSC performed various activities related to the clean-up of the Site. From November 1993 to May of 1994, for example. DTSC engaged in activities related to the physical removal of contaminated waste at the Site. (Opp. at pp. 4–5; Landis Decl., Ex. 22, p. 604; *and* Amir Dec., ¶ 9.) More recently, between May and November 1998, contractors performed various activities on the Site including the stabilization of the Site for emissions control, air monitoring during removal activities, removal and disposal of large surface debris, disposal of small containers and drums, and demolishing lead-processing equipment and facility structures on the Site. (Amir Decl., ¶ 19.)

The dispute between the parties can be easily summarized. The moving parties contend that the three year statute of limitations began to run after the state completed the physical removal of hazardous waste and the above ground structures on the Site. (*See* P. & A., at p. 2 n. 2, 4–5 & 11–19.) Defendants make a distinction between "removal actions" and "remedial actions." [2] (*See e.g. id.* at p. 8.) Defendants suggest that more recent activities are re-

---

**1.** After the instant motion was filed, the Court granted summary judgment on an earlier filed motion for summary judgment regarding the useful products and recycling exemption. Except for Defendant J.L. Shepherd & Associates, it appears that the instant motion is therefore moot as to most of the moving parties.

**2.** This distinction is important because CERCLA, 42 U.S.C. § 9613(g)(2)(A) provides: "An initial action for recovery of the costs ....must be commenced—

(A) *for a removal action,* within 3 years after completion of the removal action,...; and

(B) *for a remedial action,* within 6 years after initiation of physical on-site construction of the remedial action, except that, if the reme-

medial in nature. The state, on the other hand, argues that the removal process cannot be separated into discreet phases and that removal activities have been on-going. (*See e.g.* Opp. at pp. 12–13.) The state claims that removal is still not complete.[3] As a result, according to the state, the three year statute of limitations never expired because the three year period begins only when removal is complete. (*Id.*)

The question presented is whether the sequence of activities on the Site related to the clean-up of hazardous waste is best characterized as a single removal action; or series of separate activities divisible into discreet phases, with the completion of each phase triggering the start of the three-year statute of limitations on cost-recovery actions.

### A. Undisputed Facts [4]

#### i. *Contamination at the Site*

Alco Pacific processed and reprocessed lead on the Site from approximately 1950 through 1990. (PSGI, ¶ 3.) DTSC's interest in the Site dates to January 1993. (Amir Decl., ¶ 4.) In March of 1993, DTSC conducted soil sampling and the samples indicated "the presence of total lead well in excess of State of California screening levels." (*Id.* at ¶ 5.) In May of 1993 DTSC issued an "Imminent and Substantial Endangerment Determination because of the release and threatened release of hazard-

ous substances [on the Site]". (*Id.* at ¶ 6; Landis Decl., Ex. 8, "Determination.") In addition to the lead, which was the primary concern, DTSC also found arsenic, copper and other metals. (Landis Decl., Ex. 8 at p. 2 II.24–26.) The surface contamination included a lead-contaminated waste pile which contained approximately 1,100 cubic yards of shredded polypropylene battery chips. (*Id.* at p. 2; *and* Amir Decl., ¶ 6.) There was also a large pile of lead contaminated foundry sand. (*Id.*) In addition to the waste piles, 39 to 46 drums of hazardous waste were removed from the Site. (Landis Decl., Ex. 7, p. 193, Ex. 11, p. 10; Ex. 12 & Ex. 13.) The drums contained slag, resins, catalysts, recyclable lead, rainwater/rinsate, and debris. (*Id.*) There was also a separate set of 52 drums containing radioactive waste on the Site. (Landis Decl. Ex. 7, p. 193.) Aside from the drums and waste piles, the structures on the Site as well as the soil on the Site was later found to be contaminated with hazardous waste. (Landis Decl. Ex. 7, p. 248; *and* Ex. 42, p. 761.)

#### ii. *Sequence of Events*

On June 04, 1993, DTSC issued the owner of the Site, Morris P. Kirk, a letter stating DTSC "assessed the Alco Pacific Site and ... determined that removal of hazardous waste will be necessary." (Landis Decl. Ex. 14.) DTSC informed Mr. Kirk that it would initiate "a removal ac-

---

dial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph." 42 U.S.C. § 9613(g)(2)(A).

**3.** As a preliminary matter, Plaintiff also contends that the instant motion is improper because Defendants failed to try and meet and confer with DTSC regarding the motion. (Opp. at p. 1 n. 1.) However, it is the Court's understanding that the instant motion was filed pursuant to a modified scheduling order,

discussed and agreed upon by all parties in open court. (*See* Case Management Conference Order of July 29, 2003.) As a result, there was no need to meet and confer.

**4.** As in the last Motion For Summary Judgment, in its original Statement of Genuine Issues in Opposition to Motion, Plaintiff fails to adequately identify purported factual disputes and the evidentiary basis for the allegedly disputed facts. On January 28, 2004, Plaintiff filed a Corrected Statement of Genuine Issues in Opposition to Motion, *hereinafter* "CPSGI."

tion." (*Id.*) DTSC retained OHM Remediation Services Corporation ("OHM") to clean up the Site. (Amir Decl., ¶ 6 & 8.)

In November of 1993, approximately 1,100 cubic yards of contaminated polypropylene, and 110 cubic yards of contaminated foundry sand were removed from the Site. (*Id.*) "After the piles of waste were removed, a section of exposed soil was uncovered" at the Site. (*Id.* at ¶ 9; *and* Landis Decl., at p. 604.) The soil was graded and a chip seal cap was installed to prevent direct contact, or surface runoff, of contaminated soil. (*Id.*) That left a considerable amount of work left to be done on Site, including the removal of 52 drums of radioactive mixed waste. (Landis Decl., Ex. 22 at p. 604.) In March of 1994, 39 drums of non-radioactive waste were removed from the Site. (Landis Decl., Ex. 13, p. 463.) DTSC installed a fence on the Site in May of 1994. (*Id.*) On November 8, 1994 OHM issued a report entitled "Report of Completion of Interim Remedial Measure/Removal Action." (*Id.* at pp. 603–05.) As the title suggests, the report described the activities OHM performed on the Site. (*Id.*)

In August of 1995, DTSC issued an Imminent and Substantial Endangerment Determination and Remedial Action Order." (Landis Decl. Ex. 30.) The Order named Co–Defendant J.L. Shepherd and Assoc. ("J.L. Shepherd") as a responsible party. (*Id.*) DTSC ordered J.L. Shepherd to remove 52 drums of mixed radioactive waste from the Site. (*Id.*) According to the EPA, the radioactive waste was stored at the facility from 1988 to 1997. (Landis Decl. Ex. 42, p. 754 ¶ 9.) DTSC claims the radioactive waste was caused by a shipment of old density gauges from Defendant J.L. Shepherd. (*See id.*; *and* Amir Decl. ¶ 11.) J.L. Shepherd sent the old density gauges to the Site for Alco Pacific to recycle. (*Id.*) DTSC maintains that at least one gauge contained Cesium–137. (*Id.*) In July of 1997, under DTSC supervision, the drums containing radioactive waste were shipped to an authorized TSD facility for final disposal. (Landis Decl. Ex. 42, p. 754 ¶ 9.) According to Defendants, the removal of the radioactive waste constitutes a second and entirely separate removal action. (*See* Defendants' Statement of Fact, (*hereinafter* "DSF") ¶ 20.)

Before the drums were removed, DTSC conducted a limited surface investigation involving the collection of samples from the Site in June of 1997. (Amir Decl., ¶ 12.) The results indicated relatively high concentrations of lead. (*Id.*) Because of the hazard posed by the contaminants at the Site, and the fact that the Site was being used by transients, DTSC contacted the United States Environmental Protection Agency ("EPA") Emergency Response for their assistance in mitigating immediate hazards. (*Id.*) The EPA's assessment revealed approximately two hundred tons of lead contaminated waste including flue dust, furnace slag and battery chips deposited as a dust and debris layer on paved surfaces, slag materials in and around the rotary kiln and furnaces, as well as sludges in the processing equipment. (Landis Decl., Ex. 42 at p. 755 ¶ 11.)

In April of 1998, the EPA issued a document entitled "Unilateral Administrative Order for (Partial) Performance of Removal Action" ("EPA Administrative Order"). (Landis Decl., Ex. 42, p. 749.) The EPA Administrative Order made various findings of fact regarding contamination on the Site (*Id.* at pp. 752–53), and clean-up activities. (*see e.g. id.* at p. 754, ¶ 9.) For example, the EPA Administrative Order described the removal of 52 drums containing radioactive materials in July of 1997. (*Id.*) The EPA Administrative Order also listed removal activities that were "required by this Order" but not yet performed. (*Id.* at p. 760 ¶ 28). The EPA

Administrative Order compelled, *inter alia,* the destruction and removal of all the buildings and processing equipment on the Site and the "transporting and disposing of all hazardous wastes at an EPA approved TSD facility." (*Id.* at p. 761.)

A company by the name of ENTAC Inc. was retained to dismantle and dispose of on-site debris. ENTAC Inc. was also instructed to decontaminate the pavement. (Amir Decl. ¶ 19; *and* Landis Decl. Ex. 44.) The removal of above-ground structures began June 26, 1998. (CPSGI, ¶ 27.) On November 8, 1998, ENTAC Inc. submitted a final report to the EPA and DTSC. (Amir Decl. ¶ 19; *and* Landis Decl. Ex. 44.) The report described removal activities performed on the Site between June 26 and November, 1998. (*Id.*) EN-TAC Inc. apparently completed its activities on the Site by October 9, 2003.[5] It is unclear whether ENTAC Inc. completed all of the removal activities mandated by the EPA. Specifically, hazardous waste in the form of contaminated soil still remained on the Site and was not transported and disposed of in an EPA approved TSD facility, as required by the EPA Administrative Order. (*Compare* Landis Decl., Ex. 42, p. 761; *and* Landis Decl., Ex. 7, p. 248.)

In October 1997, DTSC contracted with Tetra Tech. Inc. ("Tetra Tech") for the development and implementation of a remedial investigation at the Site. (Amir Decl. at ¶ 14; *see also* Landis Decl., Ex. 6, "Final Remedial Investigation Report.") On March 27, 1998 Tetra Tech submitted a document to DTSC entitled Remedial Investigation Work Plan. (CPSGI, ¶ 4; Landis Decl., Ex. 5.) Tetra Tech submitted an addendum to the Remedial Investigation Work Plan in February of 2002. (*Id.*) In February of 2003, Tetra Tech submitted its final Remedial Investigation Report. (Landis Decl., Ex. 6.) In June of 2003, Tetra Tech released a document prepared for DTSC entitled "Final Draft Removal Action Workplan." (Landis Decl., Ex. 7.) The Final Draft Removal Action Workplan explains "[t]he remedial action objective for the Site is to restore the Site such that future onsite residences and existing surrounding public have no or *de minimis* incremental risk ... from exposure to lead and other COPCs in soil." [6] (*Id.* at p. 244.) In order to achieve this objective, the Workplan described three alternatives: (1) utilization of a process known as "soil washing" (*Id.* at p. 247); (2) on-site chemical treatment to stabilize or chemically immobilize contaminants (*Id.* at p. 248); or (3) soil removal with off-site disposal (*id.*).[7]

---

**5.** Defendants contend that the dismantling of above-ground structures constitutes the third removal action. (P. & A., p. 2 n. 2.) According to Defendants, the purported "third removal action" is also time barred because ENTAC Inc. completed its on-site activities on October 9, 1998. Suit was filed by DTSC on October 29, 2001, slightly more than three years after ENTAC Inc. completed its on-site activities. However, ENTAC Inc. did not submit its final report until November 8, 1998. Defendants fail to explain why the Court should deem October 9, 1998 the last date for removal activity on the Site when ENTAC Inc. did not complete its final report until November 8, 1998. Regardless, as explained in greater detail, *infra,* the Court determined that removal activities may not yet have been completed.

**6.** This wording of this document is perplexing. As the title suggests, it delineates a plan for final removal activities. However, the plan also describes the goals for remediation. (Landis Decl. Ex. 7 at p. 244.) In order to achieve those goals, the plan suggests that top-soil be removed and transported for off-site disposal. (*Id.* at p. 248.) Yet the excavation and off-site disposal of soil is plainly described as a removal activity. (*Id.* at pp. 266–282.) In summary, the Workplan uses the terms "remedial" and "removal" in a confusing manner to simultaneously refer to the same activities.

**7.** There is actually another alternative listed-to do nothing or "No Action." (*Id.* at p. 249.) However, the suggestion of "No Action" was

The Workplan suggests that the third option, removal of soil with off-site disposal, is the best method to achieve DTSC's objectives. (*Id.* at p. 258.) The moving parties would like the Court to conclude that the Workplan establishes DTSC's plans for remediation. (DSUF, ¶ 6.) However, the proposed removal of soil and off-site disposal is clearly described as a removal action in the Workplan. (*Id.* at pp. 266–282; *see also* Landis Decl., Ex. 42, p. 761.) DTSC has not yet approved the Workplan or decided what to do about soil contamination on the Site. (*See* Amir Decl. ¶ 26.) Accordingly, DTSC has not yet decided on a final course of action for clean-up of the Site. (*See id.*)

DTSC filed suit on October 29, 2001. The statute of limitations for removal actions is three years. 42 U.S.C. § 9613(g)(2)(A). According to Defendants, all removal actions completed before October 29, 1998, including the dismantling and removal of all above-ground structures, occurred prior to the statutory cut-off for cost recovery actions under CERCLA 42 U.S.C. § 9613(g)(2)(A).

## II. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for granting a motion for summary judgment. It states in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c) (2003).

This standard has been explained by the Supreme Court of the United States in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When the moving party bears the burden of persuasion on the issue at trial, its showing must sustain that burden as well as demonstrate the absence of a genuine dispute. *See Celotex Corp., supra,* 477 U.S. at 331–32, 106 S.Ct. 2548. When the moving party does not bear the burden of proof at trial, it must point out to the district court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. 2548. In *Anderson,* the Court set out the requisites needed to show there is no genuine issue as to a material fact.

> Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The Court also held that "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.*

Regarding the existence of a genuine issue of material fact, the Court held that, summary judgment is not appropriate if "the evidence is such that a reasonable

---

made to serve "as the baseline against which other remedial action alternatives can be compared." (*Id.*) If DTSC opted to do nothing, its goals would not be met. (*See id.* at

pp. 246–49 & 253.) Tetra Tech stated that soil removal and off-site disposal would be the best alternative. (*Id.* at p. 258.)

jury could return a verdict for the non-moving party." *Id.* However, the Court also noted that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. The non-moving party has the burden of producing operative facts, and the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505. If the operative facts are not presented, summary judgment is appropriate.

Once the moving party has met its burden under Rule 56(c), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. However, any inferences from the underlying facts must be viewed in light most favorable to the non-moving party. *Id.* at 587, 106 S.Ct. 1348.

In *Celotex,* the Court explained that the non-moving party must designate specific facts showing a genuine issue for trial. Summary judgment is appropriate if a party, after adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The moving party is not required to prove the absence of a genuine issue of fact, even with respect to an issue on which the non-moving party bears the burden of proof. *Id.* at 325, 106 S.Ct. 2548. "Instead ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* The *Celotex* Court also stated that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsup-

ported claims or defenses", *id.* at 323–24, 106 S.Ct. 2548, and that the summary judgment procedure should not be regarded as a "disfavored procedural shortcut" but should be viewed as an "integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327, 106 S.Ct. 2548.

"[I]t is not [the task] of the district court, to scour the record in search of a genuine issue of triable fact. [The courts] rely on the non-moving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996). *See also Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1031 (9th Cir.2001) ["The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found."]

## III. DISCUSSION

There are two issues presented in the instant motion: (1) whether activities on the Site undertaken by DTSC can be divided into separate removal actions; and (2) whether or not more recent activities can properly be characterized as "remedial" rather than "removal" actions.

### A. There Can Only Be One Single Removal Action

■ Defendant moving parties argue that there are at least two, and possibly three, separate CERCLA removal actions, each subject to CERCLA's three-year statute of limitation. (P. & A., at p. 15.) According to the moving parties, the first removal action constituted the removal of waste piles and liquid waste drums beginning in 1993 and ending in 1994. (DSF, issue No. 1, p. 4.) The second purported removal action included the removal of the cesium–137 contaminated waste drums and

occurred in 1997. (*See id.* at ¶¶ 18–21.) Finally, there is also another activity Defendants characterize as a separate event—the removal of the above ground structures at the Site—completed on October 9, 1998. (*See* P. & A., p. 5; Landis Decl., Ex. 44 at p. 824.) Suit was filed more than three years later on October 29, 2001.

▉ Defendants rely heavily on a single case, *United States of America v. Ambroid Company, Inc.*, 34 F.Supp.2d 86, 88 (D.Mass.1999), to support their theory that each major activity should be treated as a separate removal action (P. & A., at pp. 15–18.) *Ambroid, supra,* 34 F.Supp.2d at 88 stands for an exception to the general rule that all removal actions performed at a single site constitute a single indivisible removal action. *See e.g. California v. Hyampom Lumber Co.,* 903 F.Supp. 1389, 1394 (E.D.Cal.1995). In *Ambroid,* the Court held that there could be more than one CERCLA removal action at the same Site. *Ambroid,* 34 F.Supp.2d at 88. But the exception is quite narrow. *See id.* at 88–89. Indeed, *Ambroid* is the only known case where the exception has been applied. *See* e.g. 4–14 Law of Hazardous Waste § 14.01; *see also Hyampom,* 903 F.Supp. at 1394.

The *Ambroid* Court observed that the statute of limitations in CERCLA cases is interpreted broadly, *Ambroid,* 34 F.Supp.2d at 87, and that ongoing removal and remedial efforts by government agencies are generally considered one removal action, even though the activities were conducted in stages. *Id.* However, the *Ambroid* Court found a set of "unusual circumstances . . . [that] warrant a finding of separate and distinct removal actions." *See Ambroid,* 34 F.Supp.2d at 88–89.

The unusual circumstances before the *Ambroid* Court do not appear to be replicated in the instant case. *See id.* "The first unusual circumstance" in *Ambroid* was "the EPA's closing of the" site. *Id.* at 88. In *Ambroid,* the EPA completed all clean-up work, closed the site, and sealed of the premises. *Id.* at 88–89. However, the EPA was unable to dispose of all the drums on the site at issue in *Ambroid* because there were no legally approved methods of disposal for the remaining drums. *Id.* at 87. In *Ambroid,* 18 months after the site was closed, the site was broken into and the drums were scattered about prompting a second clean-up. *Id.* In the instant case, however, the Site was never closed, nor was the clean-up work ever completed. (Landis Decl. Ex. 7 at p. 248; *and* Ex. 22 at p. 604.)

"The second unusual circumstance" in *Ambroid* was "the EPA's transfer of responsibility to the site to the Massachusetts authorities after closing the site." *Ambroid,* 34 F.Supp.2d at 89. In the instant case, DTSC received help from the EPA but never transferred authority to the EPA. (Amir Decl., ¶ 12.)

"The third unusual circumstance" in *Ambroid* was "the EPA's treatment of the two removal actions as separate." *Id.* at 89. The Court in *Ambroid* found the EPA treated the two removal actions as separate because the officer in charge of the clean-up marked the file "final" and "case closed" after the first removal activities were completed. *Id.* Moreover, the EPA referred to the actions in *Ambroid* as separate removal actions. *Id.* In the instant case, however, the file was never closed and no individual removal action was characterized as a "final" action.[8] For example,

---

**8.** There were, however, "final" reports on individual actions. (*See e.g.* Landis Decl., Ex. 44.) For example, after the clean-up of the first set of drums, there was a report issued on November 8, 1994 entitled "Report on Completion of Interim Remedial Measure/Removal Action." (Landis Decl., Ex. 22; *see also* Ex. 44.)

in 1994, after the initial removal activity, the project manager for the Site signed a document that described "work remaining to be done at the site" including the removal of 52 drums of radioactive waste. (Landis Decl., Ex. 22 at p. 604.) Moreover, in its 2003 report Tetra Tech explained that cleanup of the site would not be complete until contaminated soil was removed or treated.[9] (Landis Decl. Ex. 7 at pp. 246–48.) Because the unusual circumstances present in *Ambroid* do not exist in the instant case, it would appear that all of the removal actions should be treated as a single unitary action for the purposes of the statute of limitations.

This finding conforms with the vast majority of case law discussing the issue of CERCLA statute of limitations. *See e.g. Kelley v. E.I. DuPont de Nemours & Co.,* 17 F.3d 836, 842 (6th Cir.1994) [physical removal of activities conduct by the EPA from 1984 to 1986, and later removal of waste in a separate action in 1987 were held to be one action under section 9613(g)(2)(A) ]. Indeed it seems *Ambroid* is a dubious precedent because no court appears willing to follow it. *See e.g. United States of America v. Allied Battery Co., Inc.,* 2000 U.S. Dist. LEXIS 10328, at *23–24 (N.D.Ala.2000); *see also Illinois v. Grigoleit Co.,* 104 F.Supp.2d 967, 975 (C.D.Ill. 2000); *and Reardon v. United States,* 947 F.2d 1509, 1519 (1st Cir.1991)["(t)he running of the statute of limitations is entirely within EPA's control ... (t)he government may take its own sweet time before suing, and ... the removal or remedial action may itself take years to complete."]

 The statute of limitations only begins to run at the conclusion of the entire removal phase. In *Kelley, supra,*

17 F.3d at 843, the Court of Appeals for the Sixth Circuit observed "CERCLA has two overriding objectives-cleaning up hazardous waste, and doing so at the expense of those who created it. It is simply inconsistent with these 'essential purposes,' ... to require suit on each arguably independent removal activity. Such a result could only be 'demonstrably at odds with the intentions of [the statute's] drafters.'" *Kelley,* 17 F.3d at 843 (citations omitted); *see also Geraghty and Miller, Inc. v. Conoco, Inc.,* 234 F.3d 917, 926 (5th Cir.2000) [three distinct phases implemented over a period of time spanning twelve years before suit was filed constituted a single removal action]. Moreover, the Ninth Circuit compels this Court construe CERCLA liberally, *Wilshire Westwood Associates v. Atlantic Richfield,* 881 F.2d 801, 804 (9th Cir.1989). *See also Kaiser Aluminum & Chemical Corp. v. Catellus Dev.* 976 F.2d 1338, 1340 (9th Cir.1992). Accordingly, this Court finds that there has been one single removal action in the instant case, and it would be inappropriate to divide the removal action into separate phases. *See e.g. United States v. R.A. Corbett Transport, Inc.,* 785 F.Supp. 81 (E.D.Tex.1990); *and Sherwin–Williams Co. v. Artra Group, Inc.,* 125 F.Supp.2d 739, 747–48 (D.Md.2001). On a practical level, this appears to be the correct approach because it is apparent that the clean-up of toxic waste can often only be accomplished in phases. *See id,* it would defeat the purposes of the statute to require the government to sue responsible parties at the conclusion of each phase. *Kelley,* 17 F.3d at 843.

9. Tetra Tech offered another alternative of not doing anything at all. (Landis. Decl. Ex. 7 at p. 247.) However, that alternative was offered as "a baseline against which other remedial action alternatives can be compared."

(*Id.* at p. 249.) If DTSC opted to do nothing, its goals would not be met. (*See* id. at pp. 246–49 & 253.) Tetra Tech stated that soil removal and off-site disposal would be the best alternative. (*Id.* at p. 258.)

## B. The Removal Action is Not Yet Complete and Remedial Phase Has Not Begun

■ The statute of limitations for cost recovery actions related to the removal of hazardous waste is set forth in 42 U.S.C. § 9613: An initial action for recovery of the costs .... must be commenced-

> (A) *for a removal action,* within 3 years after completion of the removal action,...; and (B) *for a remedial action,* within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph. 42 U.S.C. § 9613(g)(2)(A) & (B).

The terms "removal" and "remedial" are both defined by statute. 42 U.S.C. § 9601(23) & (24). Section 9601(23) of CERCLA states "[t]he terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment." 42 U.S.C. § 9601(23). The statutory definition also provides that removal actions "may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release" of hazardous substances. *Id.*

■■ The statutory definition for the term "remedy" overlaps the definition of the term "removal." *Compare id.; and* 42 U.S.C. § 9601(24). Subsection 24 of section 9601 defines the term "remedy" as including "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a haz-

ardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24). The statutory definition of the term "remedial" further provides:

> The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, ... and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials. *Id.*

As Judge Snyder observed in *California v. Neville Chem. Co.,* 213 F.Supp.2d 1115, 1127 (C.D.Cal.2002) "[t]he difficulty presented by these two definitions is that they both may cover the same activity." *Neville Chem., supra,* 213 F.Supp.2d at 1127 (*citing Geraghty, supra,* 234 F.3d 917, 926 (5th Cir.2000)). "[T]he CERCLA definitions [of removal and remedial] are expansive enough that certain activities may well be covered by both." *Geraghty,* 234 F.3d

at 926. As already noted, this Court must construe CERCLA liberally. *See Wilshire Westwood, supra,* 881 F.2d at 804. Furthermore, the statute of limitations is an especially disfavored defense when asserted against government entities. *United States v. Chromatex, Inc.,* 832 F.Supp. 900, 901 (M.D.Pa.1993). In *Badaracco v. Commissioner,* 464 U.S. 386, 391, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984) the Supreme Court affirmed the principle announced in *E.I. Dupont De Nemours & Co. v. Davis,* 264 U.S. 456, 462, 44 S.Ct. 364, 68 L.Ed. 788 (1924) that "[s]tatutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government." As a result, it would be incorrect as a matter of law to strictly construe the meanings of these overlapping and ambiguous terms against Plaintiff DTSC. *See id.*

■ The parties disagree as to how the terms "remedial" and "removal" should be applied to the facts in the instant case. Plaintiff argues that the removal action is not yet complete and that the statute of limitations has not been triggered. (*See e.g.* Opp. at pp. 14–15.) Defendants, on the other hand, contend that the activities taken by DTSC during the mid-nineties, *i.e.* removal of drums and waste piles from the Site, amount to independent "removal" actions. (*See* e.g. pp. 14–18.) Defendant moving parties point out that the disposal of waste drums, rubber waste piles and foundry sand were characterized as "removal actions" in DTSC's own documents, (*See* e.g. DSF at ¶¶ 10 & 18; *citing* Landis Decl. Exs. 4, 9, 15, 16, 17, 18, 19, 20, 21, 22, 32 & 34), whereas more recent activities were often characterized as "remedial" (Landis Decl. Exs. 5–7). This emphasis on

semantics, however, is probably inappropriate given the vague and overlapping definitions of the terms "removal" and "remedial." *See e.g. Public Serv. Co. v. Gates Rubber Co.,* 175 F.3d 1177, 1182 (10th Cir. 1999) ("Elements of either response action may overlap and semantics often obscure the actual nature of the cleanup performed.")[10] Both parties cite to case law in support of their respective positions.

Citing *Geraghty,* 234 F.3d 917, Defendants contend there is a "universally accepted principle that removal actions generally are immediate or interim responses, and remedial actions generally are permanent responses." (P. & A., p. 9.) One of the problems with Defendants' arguments is that in *Geraghty* the Fifth Circuit actually held three distinct phases implemented over a period of time spanning twelve years constituted a single removal action, even though some of the activities fit the definition of "remedial activities." *Geraghty,* 234 F.3d at 926–27.

Defendants cite *Hyampom, supra,* 903 F.Supp. at 1391, for the principle that "removal actions are short-term, temporary responses to an immediate threat as actions taken to assess, monitor, and evaluate a given site." (P. & A., at p. 9 ll.23–25.) Defendants also cite *Hyampom,* 903 F.Supp. at 1392–1394 for the factors to be considered in determining whether a response action at a hazardous waste site is properly characterized as a "removal" action or a "remedial action." (P. & A. at p. 10.) According to the court in *Hyampom,* in order to trigger the limitations period for remedial actions set forth in § 9613(g)(2)(B) the relevant event must possess the following attributes. "First, it

---

**10.** Moreover, as Defendants point out (P. & A., at p. 8 ll. 17–20), the question of whether an action can be properly characterized as "removal" or "remedial" is a question of law for the Court to decide. *California ex rel. California Dept. of Toxic Substances Control v.*

*Hyampom Lumber Co.,* 903 F.Supp. 1389, 1391 (E.D.Cal.1995). Accordingly, it would probably be error to place too much emphasis on the terms used by DTSC and its subcontractors to describe the actions taken to cleanup the Site.

must be "physical." Second, it must have occurred "on-site." Third, the activity must be part of the "construction of the remedial action." Fourth and finally, in addition to possessing the above characteristics, the activity must constitute the "initiation" of the remedial action." *Id.* at 1391. In the instant case, as in *Hyampom,* the first two factors are easily satisfied. The third and fourth factors merely present the same question again—whether or not the action in question can be characterized as the initiation of the remedial phase or a continuation of the removal phase. *See id.*

 However, there is no indication in the record that any activities on the Site are part of the construction of a remedial action. Indeed, the record shows that the final remedial phase has not yet started. In *California v. Neville Chem. Co.,* 213 F.Supp.2d 1115, 1128 (C.D.Cal.2002), Judge Snyder relied on *Advanced Micro Devices v. National Semiconductor Corporation,* 38 F.Supp.2d 802, 812 (N.D.Cal. 1999) for guidance on the question of whether an action is remedial or a removal action for purposes of the CERCLA statute of limitations. The court in *Neville, supra,* 213 F.Supp.2d at 1128 and in *Advanced Micro Devices,* 38 F.Supp.2d at 812 found that in order for an action to be considered "remedial," it must closely resemble the remedial plan set forth in the final remedial design. *Neville,* 213 F.Supp.2d at 1127–28 (*citing Advanced Micro Devices,* 38 F.Supp.2d at 812); *see also Hyampom,* 903 F.Supp. at 1393 [holding that a draft RAP constituted a final remedial design]. In *Neville* and *Advanced Micro Devices,* the key question was whether the action could be considered part of the implementation of the permanent remedy. *Neville,* 213 F.Supp.2d at 1128; *and Advanced Micro Devices,* 38 F.Supp.2d at 812. If an action

is part of a final and permanent remedy, then it may be remedial. *Id.* However, the final phase of clean-up at the Site has not yet started. (Landis Decl. Ex. 7 at pp. 246–48.) Indeed, DTSC has not yet approved the proposed Workplan for the Site. Actions cannot be classified as remedial when the government "had yet to issue its final decision, and only that decision will define the ultimate remedial strategy." *Geraghty,* 234 F.3d at 927.

In the instant case, DTSC's contractor, Tetra Tech, explained that clean-up of the Site would not be complete until contaminated soil was removed or treated. (Landis Decl. Ex. 7 at pp. 246–48.) Tetra Tech described the removal or treatment of the contaminated soil as two of four "remedial alternatives." (*Id.*) In *Advanced Micro Devices* the court observed that a remedial design could not be considered final while "different alternatives for final remedial action were still being evaluated," 38 F.Supp.2d at 812. In the instant case, the Final Draft Removal Action Workplan suggests three alternatives to accomplish DTSC's goals for the Site. (Landis Decl., Ex. 7.) DTSC has not yet decided on a final remedial design. (*See id.; see also* Amir Decl., at ¶ 26.) As a result, the remedial phase could not possibly have started.

Moreover, it appears that the removal and off-site disposal of soil—the procedure suggested by Tetra Tech for final clean-up of the Site—may also be properly characterized as a removal action. (*See* Landis Decl., Ex. 7, at pp. 266–282.) In its Administrative Order, the EPA described the removal, transport and disposal of all hazardous waste as a "removal activity" that had to be accomplished at the Site. (Landis Decl., Ex. 42, p. 761.) Accordingly, it is unclear whether the removal phase has

been completed. (*See* Landis Decl., Ex. 7, at pp. 266–282.)

ENTAC Inc. was hired to dismantle and remove all above ground structures on the Site. By October 9, 2003, ENTAC Inc. completed its on-site activities. But EN-TAC Inc. did not necessarily complete all the removal activities mandated by the EPA or DTSC. Specifically, hazardous waste in the form of contaminated soil still remains on the Site and was not transported and disposed of in an EPA approved TSD facility. (*Compare* Landis Decl., Ex. 42, p. 761; *and* Landis Decl., Ex. 7, p. 248.) The Court finds that the removal and off-site disposal of soil is closer to the plain meaning of the term "removal" as defined by 42 U.S.C. § 9601(23). The statute states the "terms 'remove' or 'removal' means the clean-up or removal of released hazardous substances from the environment." 42 U.S.C. § 9601(23). While the statutory definitions of "removal" and "remedial" are vague and overlap, it appears that removing contaminated soil fits more closely with the plain meaning of the term "removal." The primary definition of the term "removal" found in the Oxford English Dictionary is "the act of taking away entirely." OXFORD ENGLISH DICTIONARY (2d ed.1989). That is precisely what Tetra Tech suggests as the best method to solve the problem of continued contamination on the Site—the taking away of the top layer of soil entirely. In conclusion, it appears that at the very least, Defendants have failed to carry the evidentiary burden of showing that removal activities at the Site were completed more than three years prior to October 28, 2001, the date DTSC filed suit. As a result, summary judgment cannot be granted on the grounds that DTSC filed suit past the statutory cutoff date for cost-recovery actions.

## IV. RULING

Accordingly, Defendants' Motion for Summary Judgment is hereby DENIED.

IT IS SO ORDERED.